# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### <u>SOUTHERN DIVISION</u>

| | |
|---|---|
| JACINTA ELDER,<br>on Behalf of Herself and All Others<br>Similarly Situated,<br><br>        Plaintiff,<br><br>        vs.<br><br>BMO HARRIS BANK, N.A.,<br>FIRST PREMIER BANK, a South<br>Dakota State-Chartered Bank,<br>MISSOURI BANK AND TRUST,<br>a Missouri State-Chartered Bank,<br>and FOUR OAKS BANK &<br>TRUST CO., a North Carolina<br>Chartered Bank.<br><br>        Defendants. | **CASE NO. 13-cv-3043**<br><br><u>**CLASS ACTION COMPLAINT**</u><br><br>**RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Jacinta Elder, individually and on behalf of the Class described below, by her attorneys, makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action against Defendants BMO Harris Bank, N.A. ("BMO"),  First Premier Bank ("First Premier"), Missouri Bank and Trust ("MBT"), and Four Oaks Bank & Trust Co. ("Four Oaks") (collectively "Defendants") to recover damages and other relief available at law and in equity on behalf of herself as well as on behalf of members of the class who have been injured by Defendants' participation in a scheme to access and utilize the Automated Clearing House ("ACH") network to collect unlawful debts in violation of 18 U.S.C. § 1962 and the law of numerous states, including Maryland.

2.      This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendants, arising from their participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.      Payday loans—small, closed-end loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.     At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap. Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia (the "banned states"), and the District of Columbia.

5.     Certain payday lenders—many based offshore or purportedly on Indian reservations—make use of the Internet to circumvent these prohibitions and offer payday loans to consumers residing in these states while ignoring the laws prohibiting those very loans (the "Out-Of-State Payday Lenders").  These loans ("Out-Of-State Payday Loans") feature interest rates of 400%, 500%, and higher.

6.     Out-Of-State Payday Lenders' ability to defy state law rests on the cooperation of financial institutions like Defendants that knowingly "originate" illicit payday loan debits and credits in the mainstream electronic payments system (the "Automatic Clearing House" or "ACH Network").  These banks, known as Originating Depository Financial Institutions ("ODFIs") act as middlemen between illicit Out-Of-State Payday Lenders (many based offshore) and the mainstream electronic payments system.

7.     Indeed, it would be impossible for Out-Of-State Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states where the loans are illegal and unenforceable without

Defendants' willingness to allow the Out-Of-State Payday Lenders to access the ACH Network.

8.     BMO, First Premier, MBT, and Four Oaks, acting as ODFIs, actively participate in this unlawful scheme by working on behalf of Out-Of-State Payday Lenders to "originate" ACH entries that represent payday loan credits and debits to and from consumer checking accounts, thereby enforcing debts they know to be unlawful.

9.     Defendants know that they are crediting and debiting consumers' accounts for unlawful purposes because they know they are acting on behalf of Out-Of-State Payday Lenders and that the entries they originate on the ACH Network on behalf of such Out-Of-State Payday Lenders will credit or debit funds in states in which the Out-Of-State Payday Lenders' loans are illegal and unenforceable.  Defendants are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

10.    Defendants' illegal schemes with Out-Of-State Payday Lenders have victimized Plaintiff and millions of others.  Unless enjoined, Defendants will continue to engage in these schemes and cause substantial injury to consumers.

## PARTIES

11.    Plaintiff is a citizen and resident of Maryland and resides in the Town of Chevy Chase, and County of Montgomery.

12.    Defendant BMO is a national banking association incorporated in the State of Delaware with main offices at 111 West Monroe Street, Chicago, Illinois.

13.    Defendant First Premier is a South Dakota state-chartered bank with main offices at 601 South Minnesota Avenue, Sioux Falls, South Dakota.

14.    Defendant MBT is a Missouri state-chartered bank with main offices at 1044 Main Street Kansas City, Missouri.

15.    Defendant Four Oaks is a North Carolina state-chartered bank with main offices at 6144 US Highway 301 South, Four Oaks, North Carolina.

## OTHER PERSONS AND ENTITIES

16.    The "Out-Of-State Payday Lenders" include, but are not limited to, the following:

a.    National Payday Loan ("National Payday") is purportedly a tribal lending entity wholly owned by Guidiville Indian Rancheria.  National Payday maintains a website with an associated domain name of **www.national-paydayloan.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, National Payday engaged in the practice of making and did make illegal payday loans by making such

5

loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  National Payday is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      i.      unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

      ii.      incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

      iii.      the usurious rate was at least twice the enforceable rate.

      b.      MD Financial LLC d/b/a Access Holdings Group, LLC ("Access Holdings") is accessible online for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Access Holdings engaged in the practice of making and did make illegal payday loans by making such loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Access Holdings is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

  i.  unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

  ii.  incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

  iii.  the usurious rate was at least twice the enforceable rate.

 c.  Seaside Payday is a subsidiary of the Wakpamni Lake Community Corporation, which is purportedly a tribal lending entity wholly owned by the Oglala Sioux Tribe, South Dakota.  Seaside Payday maintains a website with an associated domain name of **www.seasidepayday.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Seaside Payday engaged in the practice of making and did make illegal payday loans by making such loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright. Seaside Payday is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

  i.  unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

      ii.      incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

      iii.      the usurious rate was at least twice the enforceable rate.

     d.     Riverbend Finance, LLC d/b/a Riverbend Cash reservation ("Riverbend Cash") is purportedly a Native American-owned business operating within the interior boundaries of the Ft. Belknap.  Riverbend Cash maintains a website with an associated domain name of **www.riverbendcash.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Riverbend Cash engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Riverbend Cash is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

      i.    unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

      ii.    incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

      iii.    the usurious rate was at least twice the enforceable rate.

e.    Cash Yes is an entity located in Belize City, Belize C.A. and maintains a website with an associated domain name of **www.cashyes.com** for the purpose of making illegal Out-Of-State Payday Loans.  At all times relevant hereto, Cash Yes engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Cash Yes is in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

  i.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

  ii.  incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

  iii. the usurious rate was at least twice the enforceable rate.

## JURISDICTION AND VENUE

17.    Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal

law.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §

1367.

18.     Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as

amended by the Class Action Fairness Act of 2005, because this lawsuit has been

brought as a class action, the aggregate claims of the putative Class members

exceed $5 million, exclusive of interest and costs, and one or more of the members

of the putative Classes are residents of a different state than Defendants.

19.     This Court has personal jurisdiction over every Defendant pursuant to

the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

20.     Alternatively, this Court also has personal jurisdiction over BMO

pursuant to Md. Code, Cts. & Jud. Proc. § 6-103(b)(4) in that Plaintiff's claims arise

from BMO personally or through an agent committing torts outside the state,

thereby causing injury to persons within the state, and which BMO should have

reasonably expected its tortious acts to have consequences in the state and from

which BMO derives substantial revenue from services rendered in the state or

derives substantial revenue from interstate or international commerce.

21.     Alternatively, this Court also has personal jurisdiction over First

Premier pursuant to Md. Code, Cts. & Jud. Proc. § 6-103(b)(4) in that Plaintiff's

claims arise from First Premier personally or through an agent committing torts

outside the state, thereby causing injury to persons within the state, and which First

10

Premier should have reasonably expected its tortious acts to have consequences in the state and from which First Premier also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

22.     Alternatively, this Court also has personal jurisdiction over MBT pursuant to Md. Code, Cts. & Jud. Proc. § 6-103(b)(4) in that Plaintiff's claims arise from MBT personally or through an agent committing torts outside the state, thereby causing injury to persons within the state, and which MBT should have reasonably expected its tortious acts to have consequences in the state and from which MBT also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

23.     Alternatively, this Court also has personal jurisdiction over Four Oaks pursuant to Md. Code, Cts. & Jud. Proc. § 6-103(b)(4) in that Plaintiff's claims arise from Four Oaks personally or through an agent committing torts outside the state, thereby causing injury to persons within the state, and which Four Oaks should have reasonably expected its tortious acts to have consequences in the state and from which Four Oaks also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

24.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to

Plaintiff's claims occurred here and because BMO, First Premier, MBT, and Four

Oaks are subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

25.     A payday loan is a short-term (typically a matter of weeks) high fee,

closed-end loan, traditionally made to consumers to provide funds in anticipation of

an upcoming paycheck.  A borrower obtaining a payday loan must either provide a

personal check to the lender or an authorization to electronically debit the

borrower's deposit account for the loan amount and associated fee as security for

the loan.  If the borrower does not repay the loan or make arrangements to extend

the loan, the lender can deposit the borrower's check or initiate an electronic

withdrawal from the borrower's deposit account.

26.     Payday loans target the most vulnerable and desperate of borrowers,

who might not qualify for a conventional unsecured loan or who are in such

desperate need of cash that they cannot wait for the formal approval process that a

conventional unsecured loan requires.

27.     Payday loans feature exorbitant annual interest rates (sometimes

misleadingly referred to as "fees") and require "balloon" repayments shortly after

the loan is made.

28.     If a borrower is unable to repay the full amount of the loan on the due

date, the lender typically gives the borrower the option to "roll over" the loan

balance by paying another "fee," usually equal to the initial interest payment at the time of loan funding.  The cycle then continues until such time as the borrower is either able to pay off the loan in full or the borrower defaults on the loan.

29.    Many borrowers repeatedly roll over or take out additional payday loans, often on the same day as a previous one is repaid.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.

30.    For these and other reasons, Maryland, along with twelve other states and the District of Columbia have outlawed payday loans.

31.    Maryland's Consumer Loan Law ("MCCL") limits the annual interest rate on payday loans as follows:

> For any loan with an original principal balance of $2,000 or less, the maximum interest rate is:
> (i) 2.75 percent interest per month on that part of the unpaid principal balance not more than $500;
> (ii) 2 percent interest per month on that part of the unpaid principal balance that is more than $500 but not more than $700; and
> (iii) 1.25 percent interest per month on that part of the unpaid principal balance that is more than $700.
> (3) For any loan with an original principal balance of more than $2,000 and not more than $3,500, the maximum interest rate is 1.75 percent interest per month on the unpaid principal balance of the loan.

Md. Code, Com. Law § 12-306.

32.     A loan made under the MCCL is civilly usurious when it imposes interest in excess of those rates.  By statute, such loans are void and unenforceable. *Id*. at § 12-314.

33.     National Payday, Cash Yes, Riverbend Cash, Seaside Payday, and Access Holdings make payday loans with interest rates 10 times or more the maximum rates identified in the foregoing paragraph.

34.     No person may make a loan under the MCCL without being licensed by the Maryland Commissioner of Financial Regulation.  Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204.  Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under [the MCCL]."

35.     National Payday, Cash Yes, Riverbend Cash, Seaside Payday, and Access Holdings are not, and have not been, licensed by the Maryland Commissioner of Financial Regulation to provide consumer loans under the MCCL.

36.     Further, under Maryland's general Interest and Usury (I&U) law, an unsecured loan is civilly usurious when it imposes an annual interest rate exceeding 24% per annum.  Md. Code, Com. Law § 12-103(c)(1)-(2).

37.     Any person who violates Maryland's I&U law is subject to treble the amount of interest and charges collected in excess of that authorized by statute.  *Id*.

at § 12-114.  A lender who knowingly and willfully violates Maryland's I&U law is also guilty of a misdemeanor.  *Id*. at § 12-122.

38.    Out-Of-State Payday Lenders, while not permitted to operate in the banned states and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in the banned states and the District of Columbia into illegal loans using an online application process.

39.    Out-of-State Payday Lenders' evasion of state law could not have been accomplished without the complicity of Defendants who provide Out-Of-State Payday Lenders with access to the ACH Network.

### The ACH Network

40.    The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing.  Instead of using paper to carry necessary transaction information, such as with checks, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

41.    The ACH Network processes two types of transactions:  Direct Deposits via ACH and Direct Payments via ACH.  "Direct Deposit" via ACH is the deposit of funds for payroll, employee expense reimbursement, government benefits, tax and other refunds, and annuities and interest payments.  It includes any ACH credit payment from a business or government to a consumer.

42.   "Direct Payment" is the use of funds to make a payment via ACH. Individuals or organizations can make a Direct Payment via ACH as either an ACH credit or ACH debit.  A Direct Payment processed as an ACH credit puts funds into an account.  An example of this is when a consumer initiates a payment through his/her bank or credit union to pay a utility bill.  A Direct Payment processed as an ACH debit takes funds from the customer's account and transfers those funds to the utility company's account.

43.   In 2012, the ACH Network processed more than 21 billion transactions with a total dollar value of $36.9 trillion.  In 2012, the ACH Network processed 9.79 billion ACH debit transactions and 6.96 billion ACH credit transactions.

44.   Rules and regulations that govern the ACH network are established by NACHA and the Federal Reserve.  NACHA manages the development, administration, and governance of the ACH Network.  BMO and First Premier are "Direct Financial Institution Members of NACHA" and, as such, influence the governance and direction of the ACH Network and the NACHA Operating Rules by participating in the NACHA Rule Making Process, voting directly on Rules ballots, and by participating in and leading NACHA Councils, committees, and initiatives.  As Direct Financial Institution Members of NACHA, BMO and First Premier are also eligible to serve on the NACHA Board of Directors and further shape regulatory, legislative, and ACH Network policies.

45.     An ACH transaction takes place in many steps.  First, an accountholder (called a "Receiver") authorizes a transaction with a merchant—the business or person providing a good or service.  That merchant (called an "Originator") then communicates the purported authorization to its ODFI.  The ODFI is a bank and a member of the ACH Network.  The ODFI then transmits the ACH debit or credit through the pass-through "ACH Operator" to the accountholder's bank, known as the Receiving Depository Financial Institution ("RDFI").  The RDFI is also a member of the ACH Network, and is the entity that actually makes the credit or debit on its customer's checking or savings account.

46.     There are also "Third-Party Service Providers" which are entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

47.     The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

48.     The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants.  The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

49.     NACHA Rules also require specific responsibilities of ODFIs, as discussed below.

## ODFIs Have Special Duties under NACHA
## Operating Rules and Guidelines

50.     NACHA characterizes ODFIs as "the gatekeepers of the ACH Network."  As the party that enables an Originator--such as Out-Of-State Payday Lenders--to initiate debit entries on the ACH Network, NACHA operating rules require an ODFI to enter into an Origination Agreement with each Originator for which it will originate entries on the ACH Network or have an arrangement with a Third-Party Sender that has such an Origination Agreement.  NACHA 2012 Operating Rules, Section 2.2, Subsection 2.2.1.

51.    An ODFI undertakes critical responsibilities under the NACHA Rules that reflect the reliance of the ACH Network on appropriate underwriting and monitoring of Originators by ODFIs.

52.    Under the NACHA Rules, "[a]n ODFI is responsible for all Entries originated through the ODFI whether by an Originator or through a Third-Party Sender . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders' compliance with these Rules."  NACHA 2012 Operating Rules, Section 2.1.

53.    NACHA Rules require all ODFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "assessing the nature of risks associated with ACH activity; performing appropriate know-your-customer due diligence; and having adequate management, information and reporting systems to monitor and mitigate risk."  *See* NACHA Operating Guidelines, Chapter 4.

54.    The NACHA Operating Guidelines caution that "ODFIs that choose to originate ACH entries . . . should be aware that both they and their Originators are subject to the NACHA Operating Rules and applicable U.S. law when transmitting these entries."  NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

55.    When an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH Operator that, *inter alia,* the entry has been properly authorized.  NACHA 2012 Operating Rules Section 2.4, Subsection 2.4.1.1 (a).

56.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Out-Of-State Payday Lenders), an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.  NACHA 2012 Operating Rules Section 2.3, Subsection 2.3.2.3 (b).

57.     Further, Subsection 2.2.1.1-2 of the NACHA Rules require ODFIs to enter into a written agreement with every Third-Party Sender or Originator (or merchant) for whom they originate ACH entries.  That agreement is to include an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

58.     Further, ODFIs have clear duties to "know your customer" and the NACHA Operating Rules make clear that they are intended to reflect that principle. NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

59.     On March 14, 2013, NACHA issued an advisory in response to certain negative press reports about collusion of ACH members with payday lenders.  In the release, NACHA reiterated the important policing duties of ODFIs:  "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its

name . . . In the case of authorizations from consumers, the NACHA Rules are explicit that, *inter alia*, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.' ***If a purported authorization is invalid under applicable law, it does not meet this standard*.**" (emphasis added)

60.    NACHA went on to say:  "Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs, among other things, should (i) exercise appropriate risk-based diligence when bringing on new Originators and Third Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other suspicious patterns of activity warrant further review or more aggressive action. For example, in 2006 the Office of the Comptroller of the Currency (OCC) released its risk management guidance for ACH activities by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their historic patterns of unauthorized returns and whether they are engaged in legitimate business activities."

61.    The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

62.     In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Out-Of-State Payday Lenders or their Third-Party Senders could violate NACHA rules.  In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

### The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties

63.     The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks.

64.     On February 25, 2005, the FDIC issued guidance regarding Payday Lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders originate through Third-Party Senders.  The FDIC guidance makes clear that:

> The use of third parties in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance with policies and applicable laws.  Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose concerns about either safety and [sic] soundness or the adequacy of protection afforded to consumers.

65.     On June 6, 2008, the FDIC issued additional "Guidance for Managing Third-Party Risk" which began by noting that:

> An institution's board of directors and senior management are ultimately responsible for managing activities conducted through third-party relationships, and identifying and controlling the risks arising from such relationships, to the same extent as if the activity were handled within the institution.

66. Among the risks to banks the FDIC identified in its June 6, 2008

"Guidance for Managing Third-Party Risk" was:

> Compliance risk. Compliance risk is the risk arising from violations of laws, rules, or regulations, or from noncompliance with internal policies or procedures or with the institution's business standards. This risk exists when the products or activities of a third party are not consistent with governing laws, rules, regulations, policies, or ethical standards. For example, some third parties may engage in product marketing practices that are deceptive in violation of Section 5 of the Federal Trade Commission Act . . . Compliance risk is exacerbated when an institution has inadequate oversight, monitoring or audit functions.

67. Accordingly, the FDIC advises banks to engage in "Due Diligence in

Selecting a Third Party":

> Following an assessment of risks and a decision to proceed with a plan to establish a third-party relationship, management must select a qualified entity to implement the activity or program. The due diligence process provides management with the information needed to address qualitative and quantitative aspects of potential third parties to determine if a relationship would help achieve the financial institution's strategic and financial goals and mitigate identified risks. Not only should due diligence be performed prior to selecting a third party, but it should also be performed periodically during the course

of the relationship, particularly when considering a
renewal of a contract.

\*\*\*\*\*

Comprehensive due diligence involves a review of all
available information about a potential third party,
focusing on the entity's financial condition, its specific
relevant experience, its knowledge of applicable laws and
regulations, its reputation, and the scope and effectiveness
of its operations and controls.

68.     On January 31, 2012, the FDIC issued revised guidance describing

potential risks associated with relationships with third-party entities that process

payments for telemarketers, online businesses, and other merchants.  In a footnote

to the guidance, the FDIC provided, "[e]xamples of telemarketing, online

businesses, and other merchants that may have a higher incidence of consumer

fraud or potentially illegal activities or may otherwise pose elevated risk" which

included "payday  or subprime loans."

69.     The FDIC advised banks that:

 . . . payment processors that deal with telemarketing and
online merchants may have a higher risk profile because
such entities have tended to display a higher incidence of
consumer fraud or potentially illegal activities than some
other businesses.  Given this variability of risk, payment
processors must have effective processes for verifying
their merchant clients' identities and reviewing their
business practices.  Payment processors that do not have
such processes can pose elevated money laundering and
fraud risk for financial institutions, as well as legal,
reputational, and compliance risks if consumers are
harmed.

70.    The FDIC made clear that banks faced potential liability if they failed

to adequately manage their relationships  with payment processors:

> Deposit relationships with payment processors expose
> financial institutions to risks not customarily present in
> relationships with other commercial customers.  These
> include increased operational, strategic, credit,
> compliance, and transaction risks.  In addition, financial
> institutions should consider the potential for legal,
> reputational, and other risks, including risks associated
> with a high or increasing number of customer complaints
> and returned items, and the potential for claims of unfair
> or deceptive practices.  ***Financial institutions that fail to
> adequately manage these relationships may be viewed as
> facilitating a payment processor's or merchant client's
> fraudulent or unlawful activity and, thus, may be liable
> for such acts or practices.***  In such cases, the financial
> institution and responsible individuals have been subject
> to a variety of enforcement and other actions. ***Financial
> institutions must recognize and understand the
> businesses and customers with which they have
> relationships and the liability risk for facilitating or
> aiding and abetting consumer unfairness or deception***
> under Section 5 of the Federal Trade Commission Act.
> (Emphasis added).

## The OCC Has Issued Guidance to All Banks
## On Managing the Risks of ACH Activity

71.    The OCC supervises national banks.

72.    On September 1, 2006, the OCC provided guidance for national banks

and examiners on managing the risks of ACH activity, explaining that "[n]ational

banks may be exposed to a variety of risks when originating, receiving, or

processing ACH transactions, or outsourcing these activities to a third party."

73.    The guidance advised:

High-Risk Activities

Banks that engage in ACH transactions with high-risk
originators or that involve third-party senders face
increased reputation, credit, transaction, and compliance
risks.  High-risk originators include companies engaged in
potentially illegal activities or that have an unusually high
volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the
board of directors should consider carefully the risks
associated with these activities, particularly the increased
reputation, compliance, transaction, and credit risks.  The
board should provide clear direction to management on
whether, or to what extent, the bank may engage in such
ACH activities.  Some banks have established policies
prohibiting transactions with certain high-risk originators
and third-party senders.

74.    In a footnote to the guidance, the OCC made the risks to banks even

clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's

reputation when *originators or third-party senders facilitate or engage in activities*

*that violate criminal laws*."  (Emphasis added).

75.    On April 24, 2008, the OCC provided guidance for national banks and

examiners on managing the risks of ACH activity originated by Third-Party

Processors, cautioning that:

Banks should also consider carefully the legal, reputation,
and other risks presented by relationships with processors

26

including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. ***Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity***.  (Emphasis added).

76.    The guidance reminded banks that they:

 . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.

*****

By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions.  In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

77.    The guidance concludes that:

The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue.  However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities.  At a minimum, bank

programs should verify the legitimacy of the processor's business operations, assess the bank's risk level, and monitor processor relationships for activity indicative of fraud.

### Defendants Knew the Out-Of-State Payday Lenders Were Engaged In Unlawful Activities

78.      At the time Defendants originated the entries on the ACH Network referenced herein, they knew the identity of the Out-Of-State Payday Lenders, they knew the lenders were engaged in the business of making payday loans, and they knew the Out-Of-State Payday Lenders were engaged in the business of making payday loans in states where payday lending was unlawful.

79.      Characteristics of Out-Of-State Payday Lender transactions themselves also notified ODFIs of unlawful activity.

80.      Whether ODFIs contract with Out-Of-State Payday Lenders or their Third Party Senders, ACH debits originated at the request of Out-Of-State Payday Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that potential unlawful activity is occurring.

81.      Chief among these "red flags" are high return rates on ACH debit transactions.  An ACH debit transaction may be returned for numerous reasons including, *inter alia¸* the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

82.     ACH debits originated on behalf of the Out-Of-State Payday Lenders far exceed the return rate for all electronic payments of less than 1%.

### FACTS AS TO PLAINTIFF JACINTA ELDER

83.     On or about July 10, 2013, Plaintiff applied for and received a payday loan in the amount of $300.00 from National Payday by completing an application on the **www.national-paydayloan.com** website.  As part of the application process, Plaintiff authorized National Payday to debit her checking account with PNC Bank in order to repay the loan.

84.     The monthly interest rate on the loan was at least 38%.  The entirety of the interest plus principal, which equaled $414.00, was due 9 days from the date of the loan.

85.     The nominal annual percentage rate on the loan was at least 1541.11 %

86.     On or about July 19, 2013 National Payday originated a debit transaction of $114.00 for Plaintiff's checking account in Maryland through the ACH Network.  The $114.00 payment was applied solely to interest and did not reduce the amount of Plaintiff's $300.00 debt.  The ODFI originating this transaction was Defendant BMO Harris Bank, N.A.

87.     On or about July 1, 2013, Plaintiff applied for and received a payday loan in the amount of $300.00 from Access Holdings after finding the company on

the internet.  As part of the application process, Plaintiff authorized Access

Holdings to debit her checking account with PNC Bank in order to repay the loan.

88.    The monthly interest rate on the loan was at least 30%.  The entirety of

the interest plus principal, which equaled $390.00, was due 14 days from the date of

the loan.

89.    The nominal annual percentage rate on the loan was at least 782.14%.

90.    On or about July 19, 2013 Access Holdings originated a debit

transaction of $90.00 for Plaintiff's checking account in Maryland through the ACH

Network.  The $90.00 payment was applied solely to interest and did not reduce the

amount of Plaintiff's $300.00 debt.  The ODFI originating this transaction was

Defendant First Premier Bank.

91.    On or about July 1, 2013, Plaintiff applied for and received a payday

loan in the amount of $500.00 from Seaside Payday by completing an application

on the **www.seasidepayday.com** website.  As part of the application process,

Plaintiff authorized Seaside Payday to debit her checking account with PNC Bank

in order to repay the loan.

92.    The loan was to be paid back in 32 bi-weekly payments for a total

finance charge of $3,875.00, including $3,375 in interest.  The monthly interest rate

on the loan was at least 30%.

93.    The nominal annual percentage rate on the loan was at least 735.0728%.

94.    On or about July 19, 2013 Seaside Payday originated a debit transaction of $150.00 for Plaintiff's checking account in Maryland through the ACH Network.  The $150.00 payment was applied solely to interest and did not reduce the amount of Plaintiff's $500.00 debt.  The ODFI originating this transaction was Defendant Missouri Bank and Trust.

95.    On or about July 1, 2013, Plaintiff applied for and received a payday loan in the amount of $500.00 from Riverbend Cash by completing an application on the **www.riverbendcash.com** website.  As part of the application process, Plaintiff authorized Riverbend Cash to debit her checking account with PNC Bank in order to repay the loan.

96.    The monthly interest rate on the loan was at least 30%.  The entirety of the interest plus principal, which equaled $650.00, was due 8 days from the date of the loan.

97.    The nominal annual percentage rate on the loan was at least 1469.69%.

98.    On or about July 19, 2013 Riverbend Cash originated a debit transaction of $150.00 for Plaintiff's checking account in Maryland through the ACH Network.  The $150.00 payment was applied solely to interest and did not

reduce the amount of Plaintiff's $500.00 debt.  The ODFI originating this transaction was Defendant Four Oaks Bank & Trust.

99.    On or about July 1, 2013, Plaintiff applied for and received a payday loan in the amount of $500.00 from Cash Yes by completing an application on the **www.cashyes.com** website.  As part of the application process, Plaintiff authorized Cash Yes to debit her checking account with PNC Bank in order to repay the loan.

100.   The monthly interest rate on the loan was at least 30%.  The entirety of the interest plus principal, which equaled $650.00, was due 16 days from the date of the loan.

101.   Thus, the nominal annual percentage rate on the loan was at least 644.12%.

102.   On or about July 19, 2013 Cash Yes originated a debit transaction of $150.00 for Plaintiff's checking account in Maryland through the ACH Network. The $150.00 payment was applied solely to interest and did not reduce the amount of Plaintiff's $500.00 debt.  The ODFI originating this transaction was Defendant Four Oaks Bank & Trust.

103.   Defendants BMO, First Premier, MBT, and Four Oaks derived a benefit through the receipt of fees for their origination of debit entries on the ACH Network initiated by National Payday, Cash Yes, Riverbend Cash, Seaside Payday,

and Access Holdings (or Third-Party Senders acting on their behalf) and received

by Plaintiff.

## CLASS ACTION ALLEGATIONS

104.   <u>Description of the Class and Sub-Class</u>:  Plaintiff brings this class

action on behalf of herself and a Class and Sub-Class defined as follows:

> i.   All natural persons within the states of Arizona,
> Arkansas, Connecticut, Georgia, Maryland,
> Massachusetts, New Jersey, New York, North
> Carolina, Ohio, Pennsylvania, Vermont, West
> Virginia, and the District of Columbia whose accounts
> were debited via an ACH entry originated by either
> BMO Harris Bank, N.A., First Premier Bank, N.A.,
> Missouri Bank and Trust, or Four Oaks Bank & Trust
> as an ODFI on behalf of an Out-Of-State Payday
> Lender in repayment of a loan which was illegal under
> the law of their respective state at the time of the debit
> (the "Class").
>
> ii.   All natural persons within the state of Maryland
> whose accounts were debited via an ACH entry
> originated by either BMO Harris Bank, N.A., First
> Premier of California, N.A., Missouri Bank and Trust,
> or Four Oaks Bank & trust as an ODFI on behalf of an
> Out-Of-State Payday Lender in repayment of a loan
> which was illegal under Maryland law (the "Sub-
> Class").

105.   Excluded from the Class and Sub-Class are Defendant's officers,

directors, affiliates, legal representatives, employees, successors, subsidiaries, and

assigns.  Also excluded from the Class and Sub-Class is any judge, justice or

judicial officer presiding over this matter and the members of their immediate families and judicial staff.

106. <u>Numerosity</u>: The proposed Class and Sub-Class are so numerous that individual joinder of all members is impracticable.

107. <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class and Sub-Class, and those questions substantially predominate over any questions that may affect individual Class and Sub-Class members. Common questions of fact and law include (a) whether payday loans are usurious and unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury; (b) whether debts owed to payday lenders are incurred in connection with the business of lending money at an usurious rate; (c) whether the usurious rate was at least twice the enforceable rate under the law of the states in which Class and Sub-Class members reside; (d) whether Defendants' collection of the illegal or unenforceable debt was made with actual or constructive knowledge of the illegality of the loans; (e) whether Defendants' collection of the illegal debt was the proximate cause of the Class's and Sub-Class's injuries; (f) whether the Class and Sub-Class suffered an injury to property by the debiting of their accounts by Defendants; and (g) whether the running of the statute of limitations for the Class's claims should be equitably tolled.

108.   Typicality:  Plaintiff's claims are typical of the claims of the members of the Class and Sub-Class.  Plaintiff and all members of the Class and Sub-Class have been similarly affected by BMO's, First Premier's, MBT's and Four Oaks's actions.

109.   Adequacy of Representation:  Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and Sub-Class and have the financial resources to do so.

110.   Superiority of Class Action:  Plaintiff and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class and Sub-Class is impractical.  Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct.  The class action device allows a single court to provide the

benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by BMO**
**(On behalf of the Class and Sub-Class)**

111.   Plaintiff incorporates by reference the preceding paragraphs.

112.   BMO is a "person" as defined by 18 U.S.C. § 1961(3).

113.   The ACH Network is comprised of the following participants:

a.   "Originators," which include individuals, corporations, or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.   "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including BMO;

c.   "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

    d. "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

    e. "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks, and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

    f. "Third-Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

114. The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

    a. Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments

(credit and debit transactions) for and between participating

depository financial institutions;

b.  To achieve this common purpose, participants in the ACH

Enterprise preserve close business relationships and maintain

established and defined roles within the enterprise;

c.  The ACH Enterprise has been in existence for many years, is still

ongoing, and has longevity sufficient to permit the participants to

achieve their common purpose.

115.   The ACH Enterprise is an enterprise engaged in and whose activities,

including daily volume batch processing of electronic payments across the United

States, affect interstate commerce.  BMO is associated with the ACH Enterprise

through its role as an ODFI within the ACH Enterprise.

116.   BMO, as an ODFI, plays a distinct role in the operation, management,

and control of the ACH Enterprise.  Under the NACHA Operating Rules, BMO

serves the critical function of "gatekeeper of the ACH Network" and is responsible

for all entries originated through BMO, whether initiated by an Originator, or by a

Third Party Service Provider acting on the Originator's behalf.

117.   In order to initiate debit entries from consumer checking accounts on

the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on

their behalf, must enter into an Origination Agreement with an ODFI, such as

BMO, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating

Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting

to each RDFI and ACH Operator that the entry has been properly authorized,

meaning that it is, among other things, compliant with the NACHA Operating Rules

and state and federal laws.

118.   BMO has used its role within the ACH Enterprise to conduct and

participate in the collection of unlawful debts by originating entries on the ACH

Network at the request of Out-of-State Payday Lenders (or Third-Party Senders

operating on behalf of Out-of-State Payday Lenders) which debit the accounts of

persons residing in states in which payday lending is illegal.  The loans made by the

Out-Of-State Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in

that the loans are:

      a.  unenforceable under State or Federal law in whole or in part as to

          principal or interest because of the laws relating to usury;

      b.  incurred in connection with the business of lending money at a rate

          usurious under State or Federal law; and

      c.  the usurious rate was at least twice the enforceable rate.

119.   BMO, in its role as an ODFI in the ACH Enterprise, originated debit

entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-

Party Senders acting on the Originator's behalf) that BMO knew routinely violate

state law; and originated debit entries that BMO knew were in violation of state

law, the NACHA Operating Rules, and FDIC and OCC guidelines.

    120.   Pursuant to the fraudulent scheme, BMO participated in the collection

of unlawful debts in that:

        a.   Out-Of-State Payday Lenders, or Third-party Senders acting on

            their behalf, initiated the transactions whereby borrowers' bank

            accounts were debited and the unlawful debts collected in violation

            of 18 U.SC. § 1962(c);

        b.   BMO then originated ACH entries by which the accounts were

            debited and the unlawful debts collected in violation of 18 U.S.C.

            §1962(c);

        c.   BMO knew that the Out-Of-State Payday Lenders were payday

            lenders and that payday loans were illegal and unenforceable in

            Arizona, Arkansas, Connecticut, Georgia, Maryland,

            Massachusetts, New Jersey, New York, North Carolina, Ohio,

            Pennsylvania, Vermont, West Virginia and the District of Columbia

            and still originated ACH debit entries into those states at the request

            of the Out-Of-State Payday Lenders in violation of 18 U.S.C.

            §1962(c).

121.   Accordingly, BMO has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

122.   As a direct and proximate result of BMO's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by BMO**
**(On behalf of the Class and Sub-Class)**

123.   Plaintiff incorporates by reference the preceding paragraphs.

124.   BMO and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

    b.   incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

   c.  the usurious rate was at least twice the enforceable rate.

125.   In furtherance of their agreement, BMO and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

     a.  Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

     b.  BMO agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

     c.  BMO knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

126.   Accordingly, BMO intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH

Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

127.   As a direct and proximate result of BMO and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by BMO and such injury was reasonably foreseeable.

### THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by First Premier Bank
### (On behalf of the Class and Sub-Class)

128.   Plaintiff incorporates by reference the preceding paragraphs.

129.   First Premier is a "person" as defined by 18 U.S.C. § 1961(3).

130.   The ACH Network is comprised of  the following participants:

a.      "Originators," which include individuals, corporations, or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.      "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including First Premier;

c.      "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.      "Receivers," which include individuals, corporations or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.      "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks, and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.      "Third-Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

131.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH network constitute an "association-in-fact"

enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

    a.    Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

    b.    To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

    c.    The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

132.   The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  First Premier is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

133.   First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First Premier,

whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

134.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First Premier, and the ODFI must originate the ACH debit.   Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

135.   First Premier has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.   The loans made by the Out-Of-State Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

      a.    unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

b.      incurred in connection with the business of lending money at at

a rate  usurious under State or Federal law; and

c.      the usurious rate was at least twice the enforceable rate.

136.   First Premier, in its role as an ODFI in the ACH Enterprise, originated debit entries initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that First Premier knew routinely violate state law; and originated debit entries that First Premier knew were in violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

137.   Pursuant to the fraudulent scheme, First Premier engaged in the collection of unlawful debts in that:

a.      Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.      First Premier then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.      First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North

Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the

District of Columbia and still originated ACH debit entries into

those states on behalf of the Out-Of-State Payday Lenders in

violation of 18 U.S.C. §1962(c).

138.   Accordingly, First Premier has directly and indirectly conducted and

participated in the conduct of the affairs of the ACH Enterprise through the

collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

139.   As a direct and proximate result of First Premier's violations of 18

U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were

injured in their property by the debiting of their bank accounts by First Premier and

such injury was reasonably foreseeable.

### FOURTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by First Premier Bank of California
### (On behalf of Class and Sub-Class)

140.   Plaintiff incorporates by reference the preceding paragraphs.

141.   First Premier and Out-Of-State Lenders, or Third Party Senders acting

on their behalf, reached an agreement to use their respective roles within the ACH

Enterprise to facilitate payday loans to consumers residing in states that banned the

practice and collect usurious interest rates in violation of state law.  Their endeavor,

if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. §

1961(6) in that the loans are:

    a.      unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

    b.      incurred in connection with the business of lending money at a rate  usurious under State or Federal law; and

    c.      the usurious rate was at least twice the enforceable rate.

142.   In furtherance of their agreement, First Premier and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

    a.      Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

    b.      First Premier agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

    c.      First Premier knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North

Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

143.    Accordingly, First Premier intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

144.    As a direct and proximate result of First Premier and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

**FIFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by MBT**
**(On behalf of the Class and Sub-Class)**

145.    Plaintiff incorporates by reference the preceding paragraphs.

146.    MBT is a "person" as defined by 18 U.S.C. § 1961(3).

147.    The ACH Network is comprised of  the following participants:

a.  "Originators," which include individuals, corporations or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.  "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including MBT;

c.  "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.  "Receivers," which include individuals, corporations, or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e.  "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks, and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f.  "Third-Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the

processing of ACH entries.  A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

148.   The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

a.   Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.   To achieve this common purpose, participants in the ACH Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.   The ACH Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

149.   The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  MBT is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

150.   MBT, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, MBT serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through MBT, whether initiated by an Originator, or by Third-Party Senders acting on the Originator's behalf.

151.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as MBT, and the ODFI must originate the ACH debit.   Pursuant to NACHA Operating Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

152.   MBT has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders

operating on behalf of Out-Of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  The loans made by the Out-Of-State Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

a.    unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

b.    incurred in connection with the business of lending money at a rate  usurious under State or Federal law; and

c.    the usurious rate was at least twice the enforceable rate.

153.   MBT, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that MBT knew routinely violate state law; and originated debit entries that MBT knew were in violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

154.   Pursuant to the fraudulent scheme, MBT engaged in the collection of unlawful debts in that:

a.    Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.    MBT then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.    MBT knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia, and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

155.   Accordingly, MBT has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

156.   As a direct and proximate result of MBT's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by MBT and such injury was reasonably foreseeable.

### SIXTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by MBT
### (On behalf of Class and Sub-Class)

157.   Plaintiff incorporates by reference the preceding paragraphs.

158.   MBT and Out-Of-State Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

    b.    incurred in connection with the business of lending money at a rate  usurious under State or Federal law; and

    c.    the usurious rate was at least twice the enforceable rate.

159.   In furtherance of their agreement, MBT and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

    a.    Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.   MBT agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.   MBT knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia, and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

160.   Accordingly, MBT intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

161.   As a direct and proximate result of MBT and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by MBT and such injury was reasonably foreseeable.

57

## SEVENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) by Four Oaks
### (On behalf of the Class and Sub-Class)

162.  Plaintiff incorporates by reference the preceding paragraphs.

163.  Four Oaks is a "person" as defined by 18 U.S.C. § 1961(3).

164.  The ACH Network is comprised of the following participants:

a.  "Originators," which include individuals, corporations, or other entities that initiate entries into the ACH Network, including Out-Of-State Payday Lenders;

b.  "ODFIs," which include all participating financial institutions that originate ACH entries at the request of an Originator or Third Party Service Provider and agree to abide by the NACHA Operating Rules, including Four Oaks;

c.  "RDFIs," which include all participating financial institutions that are qualified to receive ACH entries and agree to abide by the NACHA Operating Rules;

d.  "Receivers," which include individuals, corporations, or other entities that have authorized an Originator to initiate a credit or debit entry to a transaction account held at an RDFI;

e. "ACH Operators," which include two central clearing facilities, the Federal Reserve Banks, and Electronic Payments Network (EPN), that process ACH transactions between financial institutions; and

f. "Third Party Service Providers," which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.

The ACH Network constitutes an "enterprise" pursuant to 18 U.S.C. § 1961(4) as an association of multiple legal entities operating under NACHA. Alternatively, participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (**the "ACH Enterprise"**) in that:

a. Participants in the ACH Enterprise share a common purpose of facilitating large volume batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b. To achieve this common purpose, participants in the ACH
   Enterprise preserve close business relationships and maintain
   established and defined roles within the enterprise;

c. The ACH Enterprise has been in existence for many years, is still
   ongoing, and has longevity sufficient to permit the participants to
   achieve their common purpose.

165.   The ACH Enterprise is an enterprise engaged in and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  Four Oaks is associated with the ACH Enterprise through its role as an ODFI within the ACH Enterprise.

166.   Four Oaks, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Enterprise.  Under the NACHA Operating Rules, Four Oaks serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through Four Oaks, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf.

167.   In order to initiate debit entries from consumer checking accounts on the ACH network, Out-Of-State Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as Four Oaks, and the ODFI must originate the ACH debit.  Pursuant to NACHA Operating

Rules, when an ODFI originates an ACH entry (in this case debit), it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, among other things, compliant with the NACHA Operating Rules and state and federal laws.

168.   Four Oaks has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts by originating entries on the ACH Network at the request of Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) which debit the accounts of persons residing in states in which payday lending is illegal.  The loans made by the Out-Of-State Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

a.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

b.   incurred in connection with the business of lending money at a rate usurious under State or Federal law; and

c.   the usurious rate was at least twice the enforceable rate.

169.   Four Oaks, in its role as an ODFI in the ACH Enterprise, originated debit entries on the ACH Network initiated by Out-Of-State Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that Four Oaks knew routinely violate state law; and initiated debit entries that Four Oaks knew were in

violation of state law, the NACHA Operating Rules, and FDIC and OCC guidelines.

170.   Pursuant to the fraudulent scheme, Four Oaks participated in the collection of unlawful debts in that:

a.   Out-Of-State Payday Lenders initiated the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.   Four Oaks then originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c.   Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia, and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

171.   Accordingly, Four Oaks has directly and indirectly conducted and participated in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

172.   As a direct and proximate result of Four Oaks' violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Four Oaks and such injury was reasonably foreseeable.

## EIGHTH CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(d) by Four Oaks
## (On behalf of the Class and Sub-Class)

173.   Plaintiff incorporates by reference the preceding paragraphs.

174.   Four Oaks and Out-Of-State Lenders, or Third Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Enterprise to facilitate payday loans to consumers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

> a.   unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury;

     b.  incurred in connection with the business of lending money at a rate  usurious under State or Federal law; and

     c.  the usurious rate was at least twice the enforceable rate.

175.   In furtherance of their agreement, Four Oaks and Out-Of-State Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

     a.  Out-Of-State Payday Lenders (or Third-Party Senders operating on behalf of Out-Of-State Payday Lenders) agreed to initiate the transactions whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

     b.  Four Oaks agreed to originate ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

     c.  Four Oaks knew that the Out-Of-State Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia, and the District of Columbia and still originated ACH debit entries into those states at the request of the Out-Of-State Payday Lenders in violation of 18 U.S.C. §1962(c).

176.   Accordingly, Four Oaks intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

177.   As a direct and proximate result of Four Oaks and Out-Of-State Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by Four Oaks and such injury was reasonably foreseeable.

## NINTH CLAIM FOR RELIEF
### Assumpsit against All Defendants
### (On behalf of the Sub-Class)

178.   Plaintiff incorporates by reference the preceding paragraphs.

179.   Defendants BMO, First Premier, MBT, and Four Oaks received funds belonging to Plaintiff and members of the Class and Sub-Class.

180.   Defendants BMO, First Premier, MBT, and Four Oaks' receipt of money belonging to Plaintiff and members of the Class and Sub-Class was improper because the money represented payments of interest exceeding 24% per annum.

181.   Defendants BMO, First Premier, MBT, and Four Oaks benefited from receipt of the funds.

182.    Plaintiff and members of the Class and Sub-Class are entitled to return of the funds received by BMO, First Premier, MBT, and Four Oaks.

183.    Because the funds received from Plaintiff and member of the Class and Sub-Class are, upon information and belief, no longer in the possession of BMO, First Premier, MBT, and Four Oaks, Plaintiff has a right to restitution *at law* from BMO, First Premier, MBT, and Four Oaks.

**TENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of the Maryland Consumer Loan Law**
**Md. Code, Com. Law § 12-301, *et seq*.**
**(On Behalf of the Sub-Class)**

184.    Plaintiff incorporates by reference the preceding paragraphs.

185.    Maryland's Consumer Loan Law ("MCCL") limits the annual interest rate on payday loans as follows:

> For any loan with an original principal balance of $2,000 or less, the maximum interest rate is:
>
> (i) 2.75 percent interest per month on that part of the unpaid principal balance not more than $500;
>
> (ii) 2 percent interest per month on that part of the unpaid principal balance that is more than $500 but not more than $700; and
>
> (iii) 1.25 percent interest per month on that part of the unpaid principal balance that is more than $700.
>
> (3) For any loan with an original principal balance of more than $2,000 and not more than $3,500, the maximum interest rate is 1.75 percent interest per month on the unpaid principal balance of the loan.

Md. Code, Com. Law § 12-306.

186.   A loan made under the MCCL is civilly usurious when it imposes interest in excess of these rates.

187.   National Payday, Cash Yes, Riverbend Cash, Seaside Payday, and Access Holdings make payday loans r with interest rates 10 times or more than the MCCL's maximum rates.

188.   No person may make a loan under the MCCL without being licensed by the Maryland Commissioner of Financial Regulation.  Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204.  Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under [the MCCL]."

189.   National Payday, Cash Yes, Riverbend Cash, Seaside Payday, and Access Holdings are not, and have not been, licensed by the Maryland Commissioner of Financial Regulation to provide consumer loans under the MCCL.

190.   The Out-Of-State Payday Loans made to Plaintiff Elder in Maryland were made by Out-of-State Payday Lenders who have not been licensed by the Maryland Commissioner of Financial Regulation to make short-term loans under the MCCL.

191.    As set forth more fully above and incorporated by reference herein, the Out-Of-State Payday Loans made to Plaintiff Elder in Maryland featured interest or fees far in excess of those permitted by Maryland law.

192.    BMO, First Premier, MBT, and Four Oaks aided and abetted the Out-Of-State Payday Lenders' violations of the Maryland Consumer Loan Law by providing the necessary access to the ACH system to carry out the Out-Of-State Payday Lenders' illegal scheme.

193.    In providing the necessary access to the ACH system to carry out the Out-Of-State Payday Lenders' illegal scheme, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Out-Of-State Payday Lenders.

194.    At the time Defendants provided the necessary access to the ACH system to carry out the Out-Of-State Payday Lenders' illegal scheme, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

195.    Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

196.    Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

197.   As a result of Defendants' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the Maryland Consumer Loan Law referenced herein.

### ELEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Maryland Interest and Usury Law
### Md. Code, Com. Law § 12-101, *et seq.*
### (On Behalf of the Sub-Class)

198.   Plaintiff incorporates by reference the preceding paragraphs.

199.   Pursuant to Md. Code, Com. Law § 12-103(c)(1)-(2), unsecured written loan agreements at an interest rate greater than 24% per annum are prohibited.

200.   As set forth more fully above, in the course of making and collecting on payday loans to consumers in Maryland, Out-Of-State Payday Lenders repeatedly and knowingly charged, demanded, and accepted interest at a rate greater than 24% per annum in violation of Md. Code, Com. Law § 12-103(c)(1)-(2).

201.   Defendants aided and abetted the Out-Of-State Payday Lenders' violations of Maryland usury law.

202.   On the dates specified above, Defendants credited and withdrew money from Plaintiff's checking accounts and electronically transmitted it to the Out-Of-State Payday Lenders.

203.   In making these withdrawals, credits, and transmissions, Defendants knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Out-Of-State Payday Lenders.

204.   At the time Defendants made these electronic withdrawals and transfers, they knew the identity of the Out-Of-State Payday Lenders, including their unlawful activity.

205.   Defendants were prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

206.   Defendants were aware of the illegal nature of the lending activities of the Out-Of-State Payday Lenders through due diligence procedures.

207.   At the time Defendants transmitted these funds, they knowingly assisted the Out-Of-State Payday Lenders and were incentivized to do so by a bare profit motive.

208.   As a result of Defendants' knowing participation in the making of illegal payday loans, each is liable as an aider and abettor to the violations of the Maryland usury law referenced herein.

### TWELFTH CAUSE OF ACTION
### Permanent Injunctive Relief
### (On behalf of the Class and Sub-Class)

209.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

210.   Defendants BMO, First Premier, MBT, and Four Oaks should be enjoined and prohibited from serving as the ODFI for Out-Of State Payday Lenders and directed to immediately credit to all Out-Of-State Payday Lender borrowers any money Defendants have debited from borrowers' accounts but have not yet remitted to Out-Of-State Payday Lenders.

**WHEREFORE**, Plaintiff on her behalf and on behalf of the Class and Sub-Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)        Under 18 U.S.C. § 1964(c), awarding each member of Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which BMO was the ODFI and which represented:  (a) any payment of interest to an Out-Of-State Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Out-Of-State Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Out-Of-State Payday Lender, trebled (CT, MA, NY);

(b)        Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from BMO for BMO's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from

71

their account in which BMO was the ODFI and which represented: (a) any payment of interest to an Out-Of-State Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Out-Of-State Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Out-Of-State Payday Lender, trebled (CT, MA, NY);

(c)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from First Premier Bank for First Premier's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented:  (a) any payment of interest to an Out-Of-State Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Out-Of-State Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Out-Of-State Payday Lender, trebled (CT, MA, NY);

(d)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from First Premier Bank for First Premier's violations of 18 U.S.C. § 1962(d) consisting of a refund

of every ACH debit from their account in which First Premier was the ODFI and which represented:  (a) any payment of interest to an Out-Of-State Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Out-Of-State Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Out-Of-State Payday Lender, trebled (CT, MA, NY);

(e)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Missouri Bank and Trust for MBT's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which MBT was the ODFI and which represented:  (a) any payment of interest to an Out-Of-State Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Out-Of-State Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Out-Of-State Payday Lender, trebled (CT, MA, NY);

(f)     Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from MBT for MBT's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from

their account in which MBT was the ODFI and which represented: (a) any payment of interest to an Out-Of-State Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Out-Of-State Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Out-Of-State Payday Lender, trebled (CT, MA, NY);

(g)      Under 18 U.S.C. § 1964(c), awarding each member of Class and Sub-Class damages from Four Oaks Bank & Trust for Four Oaks' violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their account in which Four Oaks was the ODFI and which represented:  (a) any payment of interest to an Out-Of-State Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV, DC); (b) any payment in excess of the Class members' states' maximum rate to an Out-Of-State Payday Lender, trebled (MD, PA); or (c) any payment of any kind to an Out-Of-State Payday Lender, trebled (CT, MA, NY);

(h)      Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Four Oaks for Four Oaks' violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit

from their account in which Four Oaks was the ODFI and which

represented:  (a) any payment of interest to an Out-Of-State

Payday Lender, trebled (AZ, AK, GA, NJ, NC, OH, VT, WV,

DC); (b) any payment in excess of the Class members' states'

maximum rate to an Out-Of-State Payday Lender, trebled (MD,

PA); or (c) any payment of any kind to an Out-Of-State Payday

Lender, trebled (CT, MA, NY);

(i)      Permitting each member of the Sub-Class to recover damages in

assumpsit from all Defendants consisting of a refund of every

ACH debit from their account in which Defendants were the ODFI

and which represented repayment of a loan from an Out-Of-State

Payday Lender;

(j)      Compelling Defendants to disgorge in a common fund for the

benefit of Plaintiff and the Class and Sub-Class all wrongful or

inequitable proceeds received from them.  A constructive trust

should be established over all the proceeds in Defendants'

possession belonging to Plaintiff and members of the Class and

Sub-Class;

(k)     Awarding the Sub-Class damages against all Defendants as aiders and abettors to the violations of the Maryland Interest and Usury law, trebled;

(l)     Awarding the Sub-Class damages against all Defendants as aiders and abettors to the violations of the Maryland Consumer Loans law;

(m)     Granting a permanent injunction enjoining and prohibiting Defendants from serving as the ODFI for Out-Of-State Payday Lenders and directing Defendants to immediately credit to all Out-Of-State Payday Lenders' borrowers any money they have debited from borrowers' accounts but have not yet remitted to Out-Of-State Payday Lenders;

(n)     Awarding Plaintiff's attorneys' fees and costs in pursuing this action; and

(o)     Awarding such other and further relief as this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial in the instant action.

Dated:  October 11, 2013                     Respectfully submitted,

                                **TYCKO & ZAVAREEI LLP**

By:        /s/ Hassan A. Zavareei
           Hassan A. Zavareei, Bar No. 18489
           Anna C. Haac, Bar No. 28383
           Jeffrey D. Kaliel, *pro hac vice*
           *forthcoming*
           2000 L Street, N.W., Suite 808
           Washington, D.C. 20036
           Telephone: 202-973-0900
           Facsimile: 202-973-0950
           hzavareei@tzlegal.com
           ahaac@tzlegal.com
           jkaliel@tzlegal.com

**CHITWOOD HARLEY HArNES LLP**
Darren T. Kaplan, *pro hac vice forthcoming*
1350 Broadway, Suite 908
New York, NY 10018

Tel: (917) 595-3600
Fax: (404) 876-4476
dkaplan@chitwoodlaw.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel, *pro hac vice forthcoming*
Steve Six, *pro hac vice forthcoming*
J. Austin Moore, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, MO 64112

Tel:   (816) 714-7100
Fax:   (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow, *pro hac vice forthcoming*
Jason H. Alperstein, *pro hac vice forthcoming*
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301

Tel:   (954) 525-4100
Fax:   (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com